IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF LOUIS C.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF LOUIS C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLANT,

V.

ERASMO G. AND ESMERALDA B., APPELLEES.


Filed June 27, 2017.    No. A-16-1122.


Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH CRNKOVICH, Judge. Affirmed.

Donald W. Kleine, Douglas County Attorney, Jennifer C. Clark, and Megan Furey for appellant.

Peder Bartling, of Bartling Law Offices, P.C., L.L.O., for appellee Erasmo G.

Joe Bradley for appellee Esmeralda B.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

INTRODUCTION

The State of Nebraska appeals an order of the separate juvenile court of Douglas County denying motions for termination of parental rights as to Erasmo G. and Esmeralda B. Upon our de novo review, we affirm.

BACKGROUND

PETITIONS, DETENTION, AND TEMPORARY CUSTODY

Esmeralda is the biological mother and Erasmo is the biological father of Louis C. Louis was 1 year old at the time this case began.

On August 12, 2014, the State filed a petition alleging Louis to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) as a result of the faults and habits of Esmeralda. The petition alleged that Esmeralda failed to provide proper parental care, support, and/or supervision to the child; failed to provide safe, stable, and/or appropriate housing for the child; and, as a result of these allegations, the child is at risk for harm.

The State also filed an ex parte motion for immediate temporary custody. Attached to this motion was an affidavit of Omaha Police Officer Lance Worley, who received a call from the Project Harmony Child Advocacy Center concerning the safety and welfare of Louis. Worley was advised of an incident occurring at the University of Nebraska Medical Center (UNMC) during the evening of August 10. Esmeralda was admitted to the emergency room for "an apparent psychiatric crisis" and/or "overdose." It was reported that Esmeralda attempted to walk out of the hospital, leaving Louis behind. Furthermore, hospital staff had to restrain Esmeralda, as she was trying to cut herself with a plastic instrument. It was also observed that Louis had four staples in his scalp to repair an apparent laceration. The staples appeared to have been in place for a prolonged period and should have been previously removed. Worley learned that Esmeralda was subsequently admitted to Lasting Hope Recovery Center, and was unable to care for Louis. It was noted that no other suitable placement options were available at that time for Louis as an alternative to temporary foster care. The court entered an ex parte order for immediate temporary custody directing the Nebraska Department of Health and Human Services (the Department) to take custody of Louis. Since August 2014, Louis has remained in foster care.

On August 28, 2014, a detention hearing was held. The State sought continued protective custody with placement to exclude the home of the mother, which Esmeralda resisted.

Rachel Peters, a child and family specialist and initial assessment worker with the Department, testified. Upon receiving the intake report, Peters spoke with a police officer and nurses regarding the incident at the hospital. It was reported that Esmeralda came to the hospital for depression and anxiety. She provided names and numbers of claimed relatives or contacts that could care for Louis, but none of these individuals knew Esmeralda. Peters unsuccessfully attempted to contact Erasmo. Esmeralda was then admitted to Lasting Hope for suicidal ideations and hearing voices, and for the purpose of reevaluating her mental state and stabilizing medications.

Peters spoke with Esmeralda and Erasmo soon after the incident. Esmeralda explained she was taking 13 different medications, including for depression, anxiety, and diabetes. Esmeralda stated she went to the hospital in part because she missed a doctor appointment to get anxiety medication, and was suffering anxiety. She provided Peters with a doctor's letter stating she was being treated for bipolar disorder. According to the letter, Esmeralda was dismissed as a patient because she missed four appointments in 12 months, and she was being transferred to a different doctor as a result.

Erasmo stated that he was at work during the incident and unaware of the situation. Erasmo was unsure if Esmeralda was intoxicated that night, but noted her drinking had gotten "out of control" in the previous month, and she was without mental health medication for several days prior to the incident.

Based upon her investigation, Peters formed the opinion that Louis would be at risk for harm if returned to Esmeralda's care. Peters expressed concern regarding the stability of Esmeralda's mental health and the amount of medications, in combination with her drinking. Peters was also concerned that Esmeralda did not acknowledge having suicidal ideations or self-harming behaviors.

Following the detention hearing, the court entered a protective custody order. The court continued Louis' temporary custody with the Department and granted supervised visitation to Esmeralda.

On September 22, 2014, the State filed an amended petition alleging the child to be within the meaning of § 43-247(3)(a), to include the additional allegation that Esmeralda's "use of alcohol and/or controlled substances places said juvenile at risk for harm."

On November 4, 2014, the State filed a supplemental petition alleging Louis to be within the meaning of § 43-247(3)(a) as a result of the faults and habits of Erasmo. The petition alleged that Erasmo failed to provide proper parental care, support, and/or supervision to the child; failed to provide safe, stable, and/or appropriate housing for the child; and as a result of these allegations, the child is at risk for harm. The State filed an ex parte motion for immediate temporary custody. Attached was an affidavit of Brea Worthington, a family permanency specialist with the Nebraska Families Collaborative (NFC).

Worthington stated that Erasmo could not be located following Esmeralda's incident at UNMC. As a result, Louis was placed in foster care. Worthington was concerned by this instance of Erasmo failing to keep Louis safe by allowing Esmeralda to be left alone with him while in a deteriorated mental state and unable to meet his needs. Worthington was also concerned by Erasmo supporting Esmeralda's allegation that this case is the result of a conspiracy. Both Esmeralda and Erasmo expressed a delusion that the current situation was the result of actions by a man named "Roy Nelson." Worthington stated that during a meeting with both parents, Esmeralda refused to discuss her substance abuse needs or the situation resulting in Louis' removal, instead stating that Nelson was behind the incident, Nelson and her daughter are working with the Cuban army against her, and she was going to solve the issue by having a press conference to expose everyone. Esmeralda believed she saw Nelson, who was very intimidating and threatening to her, at the emergency room.

According to Worthington, Erasmo claimed to have been in confrontations with Nelson and that the current situation is a result of Nelson trying to take his wife. Erasmo claimed Nelson hired men to fly over his home with a helicopter to alter drug screens for Esmeralda. Erasmo asserts that Nelson's harassment cannot be stopped, as he is in charge of the police. Based upon Erasmo's delusional comments, potential mental health or substance abuse issues, and expressed lack of concern for Esmeralda's behavior and substance abuse, Worthington felt Louis was at risk for harm if placed back in the care of Erasmo. Worthington formed the opinion that Erasmo was unable to meet Louis' needs and provide a safe environment.

On November 4, 2014, the court entered an ex parte order for immediate temporary custody, maintaining placement of Louis with the Department. On November 13, a detention hearing was held. The State sought continued protective custody with placement to exclude the home of the father, which Erasmo did not resist. The court entered a protective custody order, continuing the temporary custody of Louis with the Department and granting supervised visitation to Erasmo.

ADJUDICATION OF LOUIS REGARDING ESMERALDA

On December 4, 2014, an adjudication hearing was held on the amended petition alleging that Louis was within the meaning of § 43-247(3)(a) regarding Esmeralda.

Bethany Walker, a family permanency specialist with NFC, testified to circumstances surrounding the family prior to the commencement of this case. A prior intake regarding Esmeralda occurred in December 2013 as a result of her admittance to the hospital for an alcohol overdose, which had occurred several times before. Esmeralda was offered services at this time, but declined. Another intake was received in January 2014 regarding lack of heat or running water in the family home, which lead to a referral for non-court services. These services included family support and random urine analyses (UA) referrals. Walker never personally witnessed symptoms of mental health issues exhibited by Esmeralda, describing her as cooperative and friendly. She stated that Esmeralda was discharged from non-court services after a final family team meeting on July 10, 2014. Walker claimed Esmeralda's completion of non-court services was "semi-successful." Esmeralda did not participate in the UA screens to ensure she was clean, but did make progress on financial goals, paying bills, and mental stability.

Mark Palacio, a registered nurse at UNMC, testified about the incident on August 10, 2014. Esmeralda appeared at the hospital to be in "psychological and physiological distress," was sweating profusely and exhibiting pressured speech. She repeated to staff "please let me die." Palacio testified that Esmeralda arrived at the hospital with Louis, who was becoming upset. Palacio witnessed Louis in distress, so he picked him up and held him. Shortly thereafter, Esmeralda attempted to leave. Security was required to escort Esmeralda into an inpatient room, at which time she was loudly yelling "let me die, let me die." Esmeralda was later discharged through Lasting Hope for inpatient psychiatric treatment after a physician's recommendation.

Bradley Canterbury, an Omaha Police Officer, reported to UNMC, heard Esmeralda yelling and screaming, and observed her being restrained. Canterbury described Louis as being odorous, and the nurses were going to bathe him. The nurses were concerned by the staples in his head. Canterbury and another officer decided it would not be in Louis' best interests to stay with his mother due to safety concerns, based upon Esmeralda's condition as well as the lack of cleanliness of the minor child.

On December 9, 2014, the court entered an adjudication order. The court found the amended petition to be true; that Louis is a minor child within the meaning of § 43-247(3)(a) insofar as Esmeralda is concerned; and that Louis should remain in the temporary custody of the Department.

ADJUDICATION OF LOUIS REGARDING ERASMO

On January 16, 2015, an adjudication hearing was held on the supplemental petition alleging that Louis is within the meaning of § 43-247(3)(a) regarding Erasmo. Erasmo admitted to the first and third counts of the supplemental petition. This plea was accepted by the court, and the second count was dismissed. In an order entered on January 26, the court found Louis to be a minor child within the meaning of § 43-247(3)(a) insofar as Erasmo is concerned, and that Louis should remain in the temporary custody of the Department.

DISPOSITION, REVIEW, AND PERMANENCY PLANNING ORDERS

Several dispositional and review hearings were held in this case and orders entered directing the parents to comply with various plans of rehabilitation.

The court ordered Esmeralda to comply with all treatment recommendations from Lasting Hope; participate in supervised visitation; complete a chemical dependency evaluation and comply with the recommendations; complete a psychological evaluation and comply with the recommendations, and provide the report to the NFC; attend Early Development Network team meetings regarding Louis; participate in relinquishment counseling; submit to random drug screens, including urinalysis testing; and provide signed releases for all mental health providers.

The court ordered Erasmo to participate in supervised visitation; maintain safe and stable housing; obtain and maintain a legal source of income; complete a psychological evaluation and comply with the recommendations; participate in individual therapy until successfully discharged; keep in contact with the family permanency specialist; attend Early Development Network team meetings; and participate in relinquishment counseling.

Testimony was received during these hearings regarding challenges arising from Esmeralda's many medications and lack of coordination among doctors, difficulty scheduling a psychological evaluation of Erasmo, refusal by Erasmo to attended a psychiatric evaluation, cancellation of a visit at the family residence due to lack of electricity or gas in the home, and a report of possible drinking by Esmeralda during a visit. Favorable testimony was also received, indicating Erasmo was attending weekly therapy and was currently employed, and that Esmeralda was having good visits with Louis, was compliant with therapy sessions and medications, and was providing negative results on UAs.

Reasonable efforts had been ordered to return Louis to the parental home with regard to both parents, including family team meetings, supervised visitation, case management, therapy, counseling, drug screens, and evaluations and referrals. However, in the November 19, 2015 order, the court determined that "no more reasonable efforts are required" by the Department moving forward regarding the parents. At the review hearing preceding this order, the Department requested that no further reasonable efforts be required due to Louis being only 3 years old, his having resided out of the home for over 15 months, and the claim that no progress had been made toward the possibility of reunification in the near future. The court noted during this review hearing that while there is love between the parents and Louis, "there has been little to no movement towards reunification."

MOTIONS FOR TERMINATION OF PARENTAL RIGHTS

On December 24, 2015, and January 19, 2016, the State filed motions for termination of parental rights with regard to Erasmo and Esmeralda, respectively. The State alleged with respect to both parents that Louis came within the meaning of Neb. Rev. Stat. § 43-292(2) (Reissue 2008) due to continued neglect, § 43-292(6) due to reasonable efforts of family preservation and reunification having failed to correct the conditions which lead to the original adjudication under § 43-247(3)(a), and § 43-292(7) as a result of Louis being in out-of-home placement for 15 or more of the most recent 22 months.

Supporting the assertion that reasonable efforts to preserve and reunify the family had been unsuccessful, the State claimed both parents failed to demonstrate appropriate behavior during visitation and failed to utilize offered services in order to reunify with their minor child. The State alleged that Erasmo failed to participate in Early Development meetings and failed to consistently visit the minor child. The State alleged that Esmeralda failed to consistently submit to urinalysis testing, failed to follow the recommendations of her chemical dependency evaluation, failed to consistently comply with medication management, failed to participate and complete a parenting class and provide proof, and failed to consistently participate with a family support worker. The State also alleged that termination of Erasmo and Esmeralda's parental rights is in the best interests of the minor child.

TERMINATION TRIAL

On May 16 and 17, July 12, and November 1, 2016, trial was held on the termination motions. Louis was 3 years old at the time of the first hearing.

Dr. Jennifer Lindner, a licensed psychologist, testified regarding a psychological evaluation of Esmeralda. Linder conducted a number of tests during the evaluation, primarily personality tests and parenting measures.

Linder diagnosed Esmeralda with schizoaffective disorder with bipolar type, which involves psychotic symptoms, delusions, incoherent thoughts, and thought derailment. She noted this disorder includes problems with "reality testing," and there is "an affective piece or a mood disorder" that accompanies it. Regarding the bipolar type, this reflects the existence of emotional lability, symptoms of depression, and symptoms of mania that coexist with the psychotic symptoms. Linder noted this diagnosis is typically long-term, but is controllable. Linder testified that working with a therapist is critical in managing such a diagnosis. Psychotropic medication is "almost always necessary" as well, but may be difficult for a patient with this diagnosis to manage alone. An individual with this diagnosis can be unstable and unpredictable without proper treatment. Linder noted this diagnosis and corresponding symptoms may affect one's ability to safely parent a child, because the parent may not always be in the present due to problems with reality and being consistently coherent. Linder had concerns based upon Esmeralda exhibiting instability and unpredictability, and lapsing in and out of awareness of the present reality.

Maria Mojica-Rangel, a licensed psychiatric nurse practitioner, testified regarding her assessment and diagnosis of Esmeralda. Mojica-Rangel diagnosed Esmeralda with bipolar disorder, type I, most recent episode mania with psychotic features. According to Mojica-Rangel, Esmeralda expressed delusions regarding people trying to take Louis, being followed by paparazzi,

and that Nelson "is romantically interested in her and uses helicopters and planes to spy on her." Esmeralda was placed on a medication regimen.

Mojica-Rangel testified that during her treatment of Esmeralda, there were often no-shows or patient cancellations, so they did not meet every two weeks as recommended. However, Esmeralda would call to reschedule. Mojica-Rangel was concerned about Esmeralda taking her medication as directed, because there did not appear to be much improvement, and Esmeralda would restart a medication that Mojica-Rangel had recommended she discontinue. There was also concern arising from Mojica-Rangel prescribing other medications, which Esmeralda would take for a short time, then stop and complain she was not tolerating them. Mojica-Rangel testified that Esmeralda continued to display delusional or psychotic features, specifically referring to Nelson, who was doing all he could to take Louis away, and who had police and physicians working for him. Mojica-Rangel described Esmeralda as being "very up and down." She indicated that Esmeralda was at times present and not delusional, more focused on court matters and getting Louis back, and not having as many issues with anxiety.

Esmeralda subsequently terminated care with Mojica-Rangel. Mojica-Rangel testified that Esmeralda called and reported experiencing worsening anxiety and tremors, had been seen at the emergency room two weeks prior, and stopped taking Seroquel, a schizoaffective bipolar disorder medication. Mojica-Rangel testified that Esmeralda became angry and shouted over the phone that she does not have bipolar disorder and wanted to restart taking Effexor, an antidepressant and anti-anxiety medication. Mojica-Rangel did not recommend using Effexor because it could activate Esmeralda's bipolar disorder. During certain visits Esmeralda would acknowledged this recommendation, but on other occasions would "be adamant about restarting" Effexor. Esmeralda requested to see a psychiatric medical doctor, so Mojica-Rangel facilitated a transfer of care per her request.

Jacqueline Thompson, a dual diagnosis therapist, testified regarding her substance abuse and mental health evaluation of Esmeralda. Thompson testified that Esmeralda repeated the delusion that "Nelson had stolen her child in conjunction with UNMC staff."

Thompson diagnosed Esmeralda with alcohol use disorder, mild. Based upon Esmeralda's diagnosis, Thompson recommended ongoing therapy, focusing on mental health, and monitoring for substance abuse.

Kathy Martin, an employee of the Omaha Public Schools Early Development Network (Network), testified regarding efforts to provide early childhood development services to Louis. Erasmo approved an evaluation of Louis by a teacher and speech therapist. Martin sought to set up a meeting with the family to review the evaluation findings and create a plan to address Louis' needs. Esmeralda responded by informing Martin that they "are not to touch the child." She did not feel Louis needed services. Esmeralda called the police when Network workers were in the home, and called the child abuse hotline to report that the Network was abusing Louis when they tried to call and arrange for a meeting. Once a court order was issued and the foster parent was designated as educational surrogate, speech therapy services were provided to Louis at the foster parent home as a result of these difficulties.

Jaclyn Rahaman, director of in-home services at Apex Foster Care, testified regarding their provision of supervised visitation to the family from May to July 2015. Parenting time was

provided three times a week for two hours at a time, with both parents present. Rahaman testified that the visits occurred on a consistent basis, without any problems.

Jairo Rodriguez, a licensed mental health counselor, testified regarding therapy provided to Esmeralda and Erasmo. The primary treatment goal for Esmeralda and Erasmo was decreasing anxiety and stress, caused by separation from Louis and the reunification process. Rodriguez stated that Esmeralda "was always concerned about complying with court orders, with case workers' orders or recommendations . . . [s]he always wanted to do as asked." Erasmo expressed a similar concern regarding compliance with court orders.

Strategies were implemented to reduce stress, including trying to consistently follow case worker recommendations, maintaining the home as a safe place for Louis, complying with doctor recommendations regarding medication, and communicating consistently with case workers. Rodriguez testified that both parents were willing to follow his recommendations, and that the strategies were helpful. Rodriguez confirmed that, in his professional opinion, both parents have worked toward reunification with Louis. At the time of trial, Rodriguez was not prepared to discharge either parent, as both were still experiencing stress from the reunification process.

Rodriguez was aware that visits had not occurred since December 2015, based upon aggressive statements made by Esmeralda towards a transportation person. Rodriguez explained that he found Esmeralda's aggressive statements concerning based on her diagnosis, but that these statements could have been more the result of frustration than aggression, improperly interpreted based upon cultural differences.

Lidia Ritonya, a visitation worker, testified regarding her observations during visitation from approximately July or August 2014 until April 2015. Visitation occurred during this time in the family home for three hours three times per week.

Ritonya noted that visits were consistent and generally went well. However, she expressed concern due to uncleanliness of the residence, and the manner in which Esmeralda and Erasmo fed Louis, due to lack of fresh food. Ritonya testified that during one visit, Esmeralda was drunk, Ritonya located a cup with alcohol, and the visit was terminated immediately. Ritonya observed during another visit that Esmeralda appeared drunk, due to the way she was walking and talking, and she smelled alcohol. Erasmo would try to cover for Esmeralda and say she was not drunk.

Ritonya testified about bizarre behavior exhibited by Esmeralda, including an instance when Ritonya arrived for a visit, and Esmeralda began "yelling and screaming." Ritonya ended the visit and called the police. She later received a call from the police, stating that Esmeralda accused her of kidnapping Louis. Ritonya noted other visits where Esmeralda would yell at her, leading Ritonya to terminate the visit.

Mara Wilson, a family permanency specialist with the NFC, testified regarding her management of the case and interactions with the parents, discussing various areas of concern and rehabilitation. Wilson "assessed that mental health and coping skills were a need for the family." Wilson identified strengths to include the parents demonstrating a strong bond with Louis during visitation, giving affection to Louis, and insuring food was available at all visits. There was no history of domestic violence between the couple, and support from their church and Esmeralda's adult child was present.

Wilson testified that Erasmo completed an initial diagnostic interview, as well as psychological and psychiatric evaluations, as ordered by the court. The psychiatric evaluation recommended that Erasmo complete a neuropsychological evaluation, which he completed voluntarily without court order.

Wilson testified that Erasmo suffered from mental illness, in the form of a shared delusional disorder, and a lower IQ. Shared delusional disorder is "based on a person's cognitive abilities." According to Wilson, this disorder would make Erasmo susceptible to believing outlandish statements by Esmeralda. Wilson treated Esmeralda's mental health issues as the primary means of addressing Erasmo's shared delusional disorder.

Wilson testified that Erasmo and Esmeralda both participated in individual and family therapy with Rodriguez. Esmeralda and Erasmo voluntarily maintained their therapeutic relationship with Rodriguez after the court ordered that no further reasonable efforts were necessary.

Wilson opined that Esmeralda has a history of noncompliance regarding medication, and failing to follow through on referrals. Wilson testified about an occasion when she visited the parents' residence and attempted to facilitate the establishment of services with a new psychiatric provider. According to Wilson, Esmeralda and Erasmo were pacing around her in the living room, and were yelling at her. Wilson left the home, as she became concerned for her safety. Following this incident, Esmeralda began seeing a doctor through a psychiatric provider. It was reported that Esmeralda only failed to participate in one appointment since that time.

Wilson provided Esmeralda with various ways to accomplish recommendations from her chemical dependency evaluation, including weekly Alcoholics Anonymous meetings, parenting classes, family support services, and continuing therapy. Esmeralda did not participate in the family support services. Wilson testified that to her knowledge, Esmeralda had not completed the parenting class. No proof was provided that Esmeralda attended Alcoholics Anonymous meetings. Esmeralda did continue with therapy. Urinalysis testing was discontinued after the court ordered no more reasonable efforts were necessary. Prior to this point, Esmeralda was consistent with urinalysis testing "some months," but failed to submit to several drug screens.

Wilson testified that Erasmo participated in more than 70 percent and Esmeralda participated in more than 90 percent of scheduled visits with Louis from June through December 2015. Wilson had no concerns regarding Erasmo's behavior during this period of visitation. Erasmo brought Esmeralda's intoxication to the attention of a visitation worker on one occasion. Wilson opined that Erasmo made progress during this period of visitation.

Wilson confirmed that official visitation ended shortly after the November 2015 court order providing that no more reasonable efforts were necessary. Visitation occurred for a few weeks after the order on a voluntary basis, but were halted due to the visitation worker being concerned for her safety. It was reported that Erasmo made comments about raping women in Mexico, and after visitation was ended, Esmeralda called the worker in December 2015, stating that she was going to blow her up with dynamite. Wilson felt visits were a safety concern for Louis and the visitation workers, and visitation has been halted since December 2015. Wilson further testified that during a visit in August 2015, Esmeralda threatened to kill the judge assigned to this case, and

often threatened to contact the FBI. The parents petitioned to have visitation reinstated after their cessation, but this was denied by the court.

Wilson testified regarding the monthly family team meetings she held with the parents. During meetings, the parents made consistent requests to have additional contact with Louis. Wilson also reported that Esmeralda and Erasmo "refused to accept any responsibility" during these meetings for Louis being brought into care. The parents instead insisted that Nelson is involved with hospitals, the State, and the courts, and Nelson is "obsessed" with Esmeralda and wanted to steal a "white Mexican baby," which is why Louis became a state ward. Wilson confirmed that the parents were hard to work with because they blamed everyone else. She described the parents as "combative," making it difficult to provide services to the family. Esmeralda and Erasmo continued to attend these meetings on a voluntary basis after the court ordered that no further reasonable efforts were necessary.

Wilson opined that Esmeralda and Erasmo made insufficient progress in alleviating concerns that resulted in Louis' removal, based upon both parents' combativeness and refusal to take responsibility for the reason Louis came into care. She felt mental health concerns had not been effectively addressed based upon the continuing delusions. Wilson acknowledged that Esmeralda and Erasmo demonstrated a strong bond with Louis, and showed affection towards him.

Wilson formed the opinion that Esmeralda and Erasmo's parental rights should be terminated based on lack of progress, along with a consideration of the parents' inability or refusal to understand that Louis has behavioral, mental health, and educational needs; ongoing safety concerns based on the parents' mental health; and the length of foster placement.

Wilson did not believe there were any additional services she could provide that would facilitate reunification. She testified that the parents "have participated in nearly all of the services that would have been recommended or provided," but it has not changed their behavior or understanding as to what brought Louis into care, and has not altered the parents' ability to care for Louis' needs.

MOTIONS TO DISMISS AND COURT'S RULING

Following the presentation of evidence and close of the State's case, Esmeralda and Erasmo's attorneys each moved to dismiss the respective termination motions, alleging failure to present a prima facie case. Erasmo's attorney argued that the testimony of the State's witnesses was more consistent with allegations pursuant to § 43-292(5), regarding parents unable to discharge parental responsibilities because of a prolonged indeterminate period of mental illness or deficiency, rather than allegations pursuant to § 43-292(2), (6), and (7). The court asked the State if it wished to respond to the dismissal motions, but it declined.

The court granted the motions to dismiss, and dismissed both motions for termination of parental rights. Specifically, the court reasoned that the termination motions "do not comport with the evidence, which was that both -- generally that the barrier for both parents is their mental illness and it is that that impairs their ability to make changes and to be reunified." The court ordered Louis to remain in the custody of the Department for appropriate care and placement, and the matter would be reviewed at a later date.

On November 4, 2016, the court entered an order dismissing the termination motions. The court further ordered that a juvenile review and permanency planning hearing was to be held on November 17.

The State subsequently perfected this appeal.

## ASSIGNMENTS OF ERROR

The State assigns, restated, that the juvenile court erred in (1) dismissing the motions for termination of parental rights as to Esmeralda and Erasmo, as the State presented sufficient evidence to support termination under § 43-292(2), (6), and (7); and (2) sustaining the motions for dismissal by Esmeralda and Erasmo and finding that the State failed to make its prima facie case.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Cassandra B. & Moira B.*, 290 Neb. 619, 861 N.W.2d 398 (2015). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

## ANALYSIS

The primary issue for this court to address on appeal is the impact of the State's failure to allege mental deficiency pursuant to § 43-292(5) as a basis for terminating Esmeralda and Erasmo's parental rights, in light of the substantial evidence presented at trial relating to the mental health of both parents.

The juvenile court made no specific findings as to the statutory factors for termination of parental rights under § 43-292, or the best interests of Louis. Rather, the court simply found the State failed to present a prima facie case that termination of Erasmo's and Esmeralda's parental rights was appropriate, based on the evidence presented at trial not comporting with the termination petition allegations made pursuant to § 43-292(2), (6), and (7). Specifically, the court found the evidence to indicate "generally that the barrier for both parents is their mental illness and it is that [illness] that impairs their ability to make changes and to be reunified" with the minor child.

Regarding the impact of the State's failure to allege § 43-292(5) within the petitions, and correspondingly how evidence of mental deficiency should be treated in the absence of such an allegation, this court finds *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000), instructive.

In *In re Interest of Michael B. et al.*, the State filed a petition seeking termination of the mother's parental rights pursuant to § 43-292(2), (4), (6) and (7). Evidence was presented that the mother disciplined the children through physical abuse; exhibited debauchery and habitual use of alcohol and narcotics in the presence of the children; the children were exposed to repeated lewd and lascivious material and behavior; the children exhibited sexualized behavior; the mother was aware of sexual abuse of her daughter by the father, but failed to stop the abuse; and the mother associated with alcohol dependent persons and those involved in abusive relationships with children. The State also presented testimony of two psychological expert witnesses. The first

witness testified to the mother having "possible borderline intelligence" and a "mixed personality disorder with paranoid and antisocial behaviors." *In re Interest of Michael B. et al.*, 258 Neb. at 547, 604 N.W.2d at 408. The second witness testified that the mother is "intellectually limited," "functioning on a borderline retarded range of ability," and gave the opinion that the mother has a mental deficiency. *Id.* at 547, 548, 604 N.W.2d at 408.

The mother's parental rights in *In re Interest of Michael B. et al.* were terminated by the juvenile court pursuant to the four alleged statutory sections. The juvenile court also found that "the State had shown by clear and convincing evidence that [the mother] had a mental deficiency which would continue for a duration preventing her from reuniting with and caring for her children." *Id.* at 548, 604 N.W.2d at 408. On appeal, the mother argued that the termination of her parental rights was based on a finding that she had a mental deficiency but that the State did not allege such a ground for termination under § 43-292(5).

The Supreme Court in *In re Interest of Michael B. et al.* held that because the State did not allege mental deficiency as that term is defined in § 43-292(5), it was improper for the State to put forth evidence of the mother's mental deficiency, as such evidence was immaterial. "Whether this failure was an oversight or an attempt to save costs so that a guardian ad litem would not have to be appointed by reason of an allegation under § 43-292(5) does not make any difference." *In re Interest of Michael B. et al.*, 258 Neb. at 555, 604 N.W.2d at 412. Nevertheless, the court found that there was clear and convincing evidence independent of any mental deficiency that the mother was an unfit parent by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was found to be seriously detrimental to the health, morals, or well-being of the juveniles. Therefore, the court found that the mother's parental rights were properly terminated pursuant to § 43-292(4) since only one ground for termination need be proved in order to terminate parental rights. The court also found termination to be in the children's best interests, and affirmed.

In *In re Interest of Michael B. et al.*, the Supreme Court considered its prior opinion of *In re Interest of J.N.V.*, 224 Neb. 108, 395 N.W.2d 758 (1986). *In re Interest of J.N.V.* similarly involved the State presenting evidence of the mother's mental deficiency in support of termination without having alleged mental deficiency under § 43-292(5); instead seeking termination pursuant to § 43-292(2). In *In re Interest of J.N.V.*, the mother gave birth to her baby on the floor of a kitchen; had no plans to care for the newborn baby; had no clothing, crib, or food for herself or the baby; and was diagnosed as a paranoid schizophrenic who, the day before the hearing, did not respond to efforts to communicate with her, either individually or in groups; exhibited extreme anger; was continually nervous and agitated; and threatened suicide. The Supreme Court upheld the termination pursuant to § 43-292(2), although it noted:

> It is true that the State might have elected to assert as a ground for terminating her rights the mother's inability to discharge her parental responsibilities because of her long-term mental illness or deficiency, § 43-292(5), or that more careful advocacy on the part of the State would have suggested that it amend its pleading by adding § 43-292(5) as a ground for the judgment it sought. . . .
>
>    . . . .

> . . . While it might have been kinder in these sad and unfortunate circumstances for the State to have proceeded under § 43-292(5), it was not required to do so.

*In re Interest of J.N.V.*, 224 Neb. at 111-12, 395 N.W.2d at 760-61.

The court in *In re Interest of Michael B. et al.* found the facts of *In re Interest of J.N.V.* to be easily distinguishable from its case, recounting the significant evidence which supported termination under § 43-292(4), independent of any mental deficiency of the mother.

Based upon our de novo review of the record in the present case, we conclude, as did the court in *In re Interest of Michael B. et al.*, that the State could not rely upon the extensive evidence of mental illness presented in this case without alleging mental deficiency as a ground for termination of parental rights pursuant to § 43-292(5).

The circumstances of our case are not as dire as in *In re Interest of J.N.V.*, where the mother was clearly unable to care for herself or her infant, and in which the court found sufficient evidence to support termination under § 43-292(2). *In re Interest of Michael B. et al.* involved extensive evidence of parental failings beyond mental deficiency sufficient to support termination under § 43-292(4). However, the evidence in the present case primarily related to the mental health issues of Erasmo and Esmeralda, both directly and indirectly. The record shows that Esmeralda suffers from schizoaffective disorder with bipolar type and Erasmo suffers from shared delusional disorder and a lower IQ. Many of the inappropriate actions of the parents recounted in this case were associated with their mental illnesses, including Esmeralda's and Erasmo's various outbursts and erratic behaviors, along with the shared delusion regarding Nelson.

The State argues that there was sufficient evidence to terminate under the other sections of § 43-292 alleged in the termination petitions. However, our review of the record does not reveal clear and convincing evidence of parental failings reflecting neglect or lack of participation in services to the extent that would support termination without consideration of the significant evidence of the parents' mental health issues. The record reflects that both parents made efforts to comply with court orders, and took part in most court-ordered services. The parents regularly engaged in visitation with the child according to the case plans and continued to engage in therapy and other services even after the court determined that reasonable efforts to reunify the family were no longer necessary.

The primary complaint brought by the State was that, despite progress and participation in various court ordered and voluntary services, the parents had not acknowledged their role in the problems that led to Louis' removal due to their delusion that the minor child was taken from their custody as a result of a conspiracy perpetrated by Nelson. Mental illness was the recurring theme throughout the trial as the primary factor preventing reunification, making the State's failure to pursue termination under § 43-292(5) particularly impactful.

While Erasmo's and Esmeralda's continued failure to accept full responsibility for the removal of their child, and the length of time Louis has been in foster care, is concerning, the juvenile court did not err in dismissing the termination petitions due to the State's failure to present a prima facie case as pled.

The State's assignments of error are without merit.

## CONCLUSION

Upon our de novo review, we conclude that the juvenile court did not err when it determined that the State failed to present a prima facie case that termination of Esmeralda's and Erasmo's parental rights was appropriate pursuant to § 43-292. We therefore affirm.

AFFIRMED.